UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED

JUL 2 2 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:15cr301 |
| | ) | |
| ROSCOE ORTEGA UMALI, | ) | COUNT ONE: |
|    a/k/a "Sco," | ) | Conspiracy to Commit Wire Fraud |
|    a/k/a "Scozilla," | ) | (18 U.S.C. § 1349) |
|    a/k/a "John Ortega," | ) | |
| | ) | COUNTS TWO THROUGH EIGHT: |
| JOSHUA DAVID JOHNSON, | ) | Wire Fraud |
|    a/k/a "Daniel Jensen," | ) | (18 U.S.C. § 1343) |
|    a/k/a "Derek James Olsen," | ) | |
|    a/k/a "Simon Andrews," | ) | FORFEITURE NOTICE |
|    a/k/a "Jay Thompson," | ) | |
|    a/k/a "Jason Olsen," | ) | |
| | ) | |
| ISAAC JOSHUA PEREZ, | ) | |
|    a/k/a "Alex Lee," | ) | |
|    a/k/a "Anthony Meyers," | ) | |
| | ) | |
| JEFFERSON MANISCAN, | ) | |
|    a/k/a "Yogi," | ) | |
|    a/k/a "Alvin Mayfield," | ) | |
|    a/k/a "Lance Parker," | ) | |
|    a/k/a "Tom Spiro," | ) | |
|    a/k/a "James Atwood," | ) | |
| | ) | |
| RAYMUND OQUENDO DACANAY, and | ) | |
| | ) | |
| JEN SEKO, | ) | |
|    a/k/a "Hanh Thuy Nguyen," | ) | |
| | ) | |
|       Defendants | ) | |

INDICTMENT

(October Term 2015 – At Alexandria)

THE GRAND JURY CHARGES THAT:

1

At all times material to this Indictment:

## COUNT ONE

### CONSPIRACY TO COMMIT WIRE FRAUD

#### *The Defendants and Their Co-Conspirators*

1.     Defendant ROSCOE ORTEGA UMALI, a/k/a "Sco," a/k/a "Scozilla," a/k/a "John Ortega," was an organizer and leader of the so-called "mortgage modification" scheme described below.

2.     Defendant JOSHUA DAVID JOHNSON, a/k/a "Daniel Jensen," a/k/a "Derek James Olsen," a/k/a "Simon Andrews," a/k/a "Jay Thompson," a/k/a "Jason Olsen," was a resident of Huntington Beach and Irvine, California.  JOHNSON opened several retail mailboxes used to receive victim payments and served as one of the leaders and organizers of the "mortgage modification" scheme.  JOHNSON also acted as a "closer," that is, someone who would serve as a "second voice" to deal with the victims after a first "customer service representative" had spoken to them, in order to give the appearance that the supposed "mortgage modification" entity was legitimate.

3.     Defendant ISAAC JOSHUA PEREZ, a/k/a "Alex Lee," a/k/a "Anthony Meyers," was a resident of Irvine, California.  As part of the "mortgage modification" scheme, PEREZ opened several retail mailboxes used to receive victim payments and managed the receipt of victim payments and the distribution of the proceeds of the scheme to the defendants and their co-conspirators.  PEREZ also served as, among other things, a "customer service representative" and was one of the principal contacts with the victims.

2

4.     Defendant RAYMUND OQUENDO DACANAY was a resident of Anaheim, California. As part of the "mortgage modification" scheme, DACANAY opened several pass-through bank accounts in the names of entities created and controlled by the defendants and their co-conspirators. The accounts were used to deposit victim payments, to make payments to promote and facilitate the scheme, and to distribute the proceeds of the scheme to the defendants and their co-conspirators.

5.     Defendant JEFFERSON MANISCAN, a/k/a "Yogi," a/k/a "Alvin Mayfield," a/k/a "Lance Parker," a/k/a "Tom Spiro," a/k/a "James Atwood," was a resident of Los Angeles, California. MANISCAN served as, among other things, a "customer service representative" and was one of the principal contacts with the victims.

6.     Defendant JEN SEKO, a/k/a "Hanh Thuy Nguyen," was the owner of Seko Direct Marketing. As part of the "mortgage modification" scheme, SEKO produced mass mailings sent to victims through Seko Direct Marketing in the names of entities created and controlled by the defendants and their co-conspirators. SEKO also leased and paid for an 888 number that was listed on mass mailings sent to victims and that was used to receive incoming calls from victims as part of the scheme.

7.     Philip O_____, a/k/a "Peter Bayani," a/k/a "Ken Nakamora," a/k/a "Billy Chan," a/k/a "Eugene Kim," a/k/a "Napoleon Wong," was a resident of Irvine, California. As part of the "mortgage modification" scheme, Philip O_____, using the alias "Peter Bayani," opened several retail mailboxes used to receive victim payments. Philip O_____ also acted as a "closer." Philip O_____ died on or about September 27, 2015.

8.      Joshua Manuel Sanchez was a resident of Huntington Beach, California, and Las Vegas, Nevada. As part of the "mortgage modification" scheme, Sanchez served as, among other things, a "customer service representative" and was one of the principal contacts with the victims. Sanchez also acted as a "closer."

9.      Kristen Michelle Ayala was a resident of Huntington Beach, California, and Las Vegas, Nevada. Ayala also served as, among other things, a "customer service representative" and was one of the principal contacts with the victims.

### The Home Affordable Modification Program

10.     In 2009, the U.S. Government launched a federally-funded mortgage assistance program called the "Home Affordable Modification Program" ("HAMP"), in an effort to reverse the rising number of home foreclosures by reducing homeowners' mortgage payments, typically by lowering their interest rates and extending the terms of the loans. HAMP, which is part of the broader "Making Home Affordable" program ("MHA"), offers federal payments to more than one hundred mortgage servicers if they successfully modify loans for qualifying homeowners.

11.     Homeowners who qualify for HAMP must complete a trial period before their mortgage will be permanently modified. There is no charge to apply for HAMP. Homeowners can apply for the program by directly contacting their existing mortgage servicer or by calling the "Homeowners' HOPE Hotline" (1-800-995-HOPE) to speak to a HUD-approved housing counselor, who will provide assistance free of charge.

12.     Claiming to do business under names such as "Equity Restoration Group," "Neighborhood Counseling Services of America," "Home Preservation Services," "Home Retention Center," "American Financial Services," "Residential Community Outreach Services,"

4

"Processing Services," and "Payment Reduction," among others, the defendants devised a scheme and artifice to defraud homeowners by leading the homeowners to believe that they were receiving a federally-funded home loan modification under the government's "Home Affordable Modification Program." In fact, however, as part of the scheme and artifice, the defendants induced the homeowners to make three supposed "trial" mortgage payments directly to the defendants through accounts that they controlled, rather than to the homeowners' mortgage lender. As a further part of the scheme and artifice, the defendants also induced the homeowners to pay a substantial "reinstatement fee" to the defendants. Neither the "trial" payments nor the "reinstatement fees" were paid to the victims' mortgage holders. Instead, they were diverted solely for the benefit of the defendants and their co-conspirators.

### *The America Online Electronic Mail System*

13.     Among the victims of the conspiracy were users of email accounts serviced by America Online (AOL), which has its headquarters in Reston, Virginia, in the Eastern District of Virginia.

14.     All email messages to AOL users, wherever the users are physically located, pass through one of four computer servers located in the Eastern District of Virginia. The email messages sent to users of the AOL email system by the defendants as part of the conspiracy and scheme and artifice to defraud were stored on one of the AOL servers in the Eastern District of Virginia at least until the email message was accessed by the victim. Thereafter, except in rare instances, an email message sent by the defendants to one of the defendants' AOL victims remained on the AOL server in the Eastern District of Virginia until the message was deleted by the victim.

### *The Conspiracy*

15.    From at least in or about October 2012 through the present, in the Eastern District

of Virginia and elsewhere, the defendants,

ROSCOE ORTEGA UMALI,
a/k/a "Sco,"
a/k/a "Scozilla,"
a/k/a "John Ortega,"

JOSHUA DAVID JOHNSON,
a/k/a "Daniel Jensen,"
a/k/a "Derek James Olsen,"
a/k/a "Simon Andrews,"
a/k/a "Jay Thompson,"
a/k/a "Jason Olsen,"

ISAAC JOSHUA PEREZ,
a/k/a "Alex Lee,"
a/k/a "Anthony Meyers,"

JEFFERSON MANISCAN,
a/k/a "Yogi,"
a/k/a "Alvin Mayfield,"
a/k/a "Lance Parker,"
a/k/a "Tom Spiro,"
a/k/a/ "James Atwood,"

RAYMUND OQUENDO DACANAY,

JEN SEKO,
a/k/a "Hanh Thuy Nguyen,"

and Joshua Manuel Sanchez and Kristin Michelle Ayala, knowingly and intentionally conspired

and agreed with each other and with others known and unknown to the Grand Jury to commit

wire fraud, that is, having knowingly and intentionally devised a scheme and artifice to defraud,

and for obtaining money and property by means of false and fraudulent pretenses,

representations, and promises, to transmit and cause to be transmitted by means of wire

6

supposed "mortgage modification" services to Michelle M_____.

85.     On or about November 12, 2013, Sanchez and Ayala and their co-conspirators, using alias "Amber Lynch" and email account a.lynch@ncsus.org, sent a message to Michelle M_____ telling her to send a supposed "reinstatement fee" of $1,634.15 to the Jeffrey Road retail mailbox opened by Philip O_____ on November 7, 2013.

86.     On or about November 12, 2013, Michelle M_____ sent by overnight mail a money order in the amount of $1,634.15 to the Jeffrey Road mailbox.

87.     On or about November 14, 2013, the defendants and their co-conspirators deposited Michelle M_____'s payment of $1,634.15 into the Comerica account with account number ending in 3418 opened by DACANAY on August 30, 2013.

88.     On or about December 20, 2013, Sanchez and Ayala and their co-conspirators, using alias "Olivia Bennet" and email account o.bennet@hpsvcs.org, sent a message to Michelle M_____ telling her to send mortgage payments of $822.31 to the Culver Drive retail mailbox opened by PEREZ on June 19, 2013.

*Victim Scott M_____*

89.     In or about December 2013, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered supposed "mortgage modification" services to Scott M_____.

90.     In or about December 2013, the defendants and their co-conspirators, using the alias "Lance Parker" and email account l.parker@ncsus.org, sent to Scott M_____'s AOL email account a message containing an attached document instructing Scott M_____ to send a

21

communication in interstate commerce writings, signs, signals, pictures, and sounds for the

purpose of executing such scheme and artifice, in violation of 18 U.S.C. § 1341.

### *The Manner and Means of the Conspiracy*

16. It was part of the conspiracy and the scheme and artifice to defraud that the

defendants and their co-conspirators would, through "Equity Restoration Group" ("ERG") and

other companies that they created and controlled (which will be collectively referred to below as

"ERG"), use targeted mass mailings sent through the U.S. Postal Service to solicit victims, the

majority of whom were in financial distress and in danger of losing their homes to foreclosure,

by offering supposed "mortgage modification" services. The mailings, generated by Seko Direct

Marketing, had deceptive titles such as "Notice of HUD Relief," "Notice of Default Alert,"

"Notice of Mortgage Relief," "Federal Loan Conversion and Reform Notification," and "New

HAMP Benefits," among others. Some of the mailings, such as the one entitled "New HAMP

Benefits," fraudulently displayed the Great Seal of the United States directly under the title. The

mailings, which were designed and intended to fraudulently induce distressed homeowners to

contact the defendants and their co-conspirators to "modify" their mortgage loans, listed various

toll-free telephone numbers for the homeowners to call for assistance. These telephone numbers

were controlled by the defendants and their co-conspirators and rather than offer home mortgage

modification advice as advertised, these numbers were used to lure would-be victims into the

scheme.

17. It was further part of the conspiracy and the scheme and artifice to defraud that

the defendants and their co-conspirators would purchase lists of pending foreclosures to target

distressed homeowners and would use the individual homeowner's name, address, lender's

7

name, and other personal information in the targeted mailings to fraudulently give an appearance of legitimacy to the targeted mailing.

18.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would falsely claim to be operating as a non-profit organization.

19.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would, when a victim homeowner called the toll-free number listed on the mailing, have an individual answering the phone collect information about the victim's finances, the victim's mortgage, and how far behind the victim was on making mortgage payments. The victim would be falsely told that this information would be reviewed to determine if the homeowner qualified for a mortgage modification through the Making Home Affordable program. The homeowner would be given the name of a representative supposedly responsible for processing the application. The victim would also be given the representative's direct dial number, typically one with a (202) area code. Victims would be subsequently contacted by someone claiming to be a representative of ERG (or one of the other entities controlled by the defendants and their co-conspirators) and would be told that their "mortgage modification" had been approved.

20.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would have the ERG representative tell the victim homeowner that the victim's lender required a supposed "reinstatement fee" or similar payment of thousands of dollars before the lender would approve the modification necessary to avoid foreclosure. The defendants and their co-conspirators would send the victim homeowner a

8

document via email or fax directing the payment of the reinstatement fee to an account controlled by the defendants and their co-conspirators.

21. It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would tell the victim homeowner that the homeowner was also required to make the three supposed "trial" modification payments to ERG. The defendants and their co-conspirators would tell the victim that when the three monthly trial payments had been received, the homeowner's modification would be complete and the new lower mortgage payment would become permanent for the life of the loan.

22. It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would tell the victim homeowners to make their checks payable to fictitious company names, such as "Payment Processing Services," "Escrow Payment Solutions," "Default Servicing," "Default Services," "Trustee Services," "Trust Services," and "Trust Funding," among others.

23. It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would send the victim homeowner via email or fax supposed mortgage payment coupons, some with the United States Treasury seal at the bottom, with instructions and amounts for making the payment. The defendants and their co-conspirators would tell the victim to make payment via cashier's check or money order and to send the payment via Federal Express or UPS to one of the fictitious companies at an address listed on the coupon.

24. It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would open bank accounts and retail mailboxes in the

9

names of the fictitious companies used in the scheme, and would use others to do so in order to hide the identity and involvement of the defendants and their co-conspirators.

25.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would generate "scripts," which contained fictitious statements to be used to convince and otherwise trick homeowners into sending the initial "reinstatement fee" and the three subsequent "trial" payments to one of the defendants and their co-conspirators' fictitious companies. These "scripts" contained detailed step-by-step lulling statements specifically designed to prey upon the victims' financial vulnerabilities.

26.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would generate internal records to organize and monitor their multitude of aliases and the fictitious companies associated with particular aliases.

27.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would obtain inexpensive, non-contractual, cellular phones, so-called "burner phones," with Washington, D.C. (202) area codes in an effort to both anonymize their communications with victims as well as to legitimize their fictitious claims to be working with the U.S. Government in Washington, D.C.

28.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would maintain records that contained victim information, including the victims' names, dates of payment, payment amounts, contact information, and email addresses.

29.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would not actually work to modify their victims'

10

mortgages, but rather deposited the victims' "reinstatement fees" and "three trial payments" in bank accounts that the co-conspirators controlled and used those funds for their own benefit or moved the victim funds to various bank accounts.

30.     It was further part of the conspiracy and the scheme and artifice to defraud that, at the same time that the defendants and their co-conspirators were inducing the victim homeowners to make payments to ERG rather than to their mortgage lenders, the defendants and their co-conspirators would contact the victims' lenders, supposedly to request a mortgage modification on the victims' behalf, so as to prevent the lenders from taking action that would alert the victims and the lenders to the fraud.

31.     It was further part of the conspiracy and the scheme and artifice to defraud that the defendants and their co-conspirators would make lulling statements to the victim homeowners if they learned that their lenders knew nothing of the supposed loan modification. For example, the defendants and their co-conspirators would tell the victim homeowner, if the victim discovered that the mortgage payments had not been received by the victim's lender or that the victim had not been granted a modification by the lender, that ERG was dealing with a higher-level employee at the victim's lender.

### Overt Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, and to accomplish its unlawful objects, the defendants and their co-conspirators did or caused to be done the following overt acts:

### Mailboxes and Bank Accounts

32.     On or about December 7, 2012, Sabrina R____ opened in the name of "Trustee Services" an account with account number ending in 7807 at Comerica.

11

33.     On or about January 8, 2013, JOHNSON and his co-conspirators, using the alias "Simon Andrews," leased a retail mailbox to receive mail for company names "Processing Services," "Accounting Services," and "Trustee Services" at Mail Today at 15568 Brookhurst Street, #326, Westminster, California. To lease the mailbox, JOHNSON presented a fraudulent California driver's license bearing a photograph of JOHNSON and the name "Simon Andrews" with driver's license number Dxxx3825. This driver's license number belonged to an individual named Rina D____.

34.     On or about January 14, 2013, JOHNSON and his co-conspirators, using the alias "Simon Andrews," leased a retail mailbox to receive mail for company names "Processing Services" and "Accounting Services" at the UPS Store at 3183 Wilshire Boulevard, #196L, Los Angeles, California.

35.     On or about February 18, 2013, Michael H____ opened in the name of "Trust Funding" an account with account number ending in 2261 at JP Morgan Chase. The account was used to deposit payments from victims of the "mortgage modification" scheme.

36.     On or about March 20, 2013, Michael H____ opened in the name of "Trust Funding" an account with account number ending in 2493 at Bank of America. The account was used to deposit payments from victims of the "mortgage modification" scheme.

37.     On or about March 22, 2013, Kelvin P____ opened in the name of "Sarrano Financial d/b/a Default Servicing" an account with account number ending in 2600 at Bank of America. The account was used to deposit payments from victims of the "mortgage modification" scheme.

12

38. On or about March 26, 2013, Kelvin P____ opened in the name of "Default Servicing" an account with account number ending in 8777 at Comerica. The account was used to deposit payments from victims of the "mortgage modification" scheme.

39. On or about April 8, 2013, JOHNSON and his co-conspirators, using the alias "Derek James Olsen," leased a retail mailbox to receive mail for company names "Accounting Department," "Escrow Services," and "Processing Department" at the UPS Store at 13217 Jamboree Rd, #530, Tustin, California. To lease the mailbox, JOHNSON presented a fraudulent California driver's license bearing a photograph of JOHNSON and the name "Derek James Olsen" with driver's license number Dxxx3857. This driver's license number belonged to an individual named Thomas H____.

40. On or about June 10, 2013, DACANAY opened in the name of "Trust Services" an account with account number ending in 3134 at Bank of America.

41. On or about June 16, 2013, PEREZ and his co-conspirators, using the alias "Michael Jeng," leased a retail mailbox at the Postal Annex at 2913 El Camino Real, #564 and #567, Tustin, California.

42. On or about June 19, 2013, PEREZ and his co-conspirators, using the alias "Michael Jeng," leased a retail mailbox at the Postal Annex at 15333 Culver Drive #340-182, Irvine, California.

43. On or about June 24, 2013, DACANAY opened in the name of "Payment Processing Services" an account with account number ending in 1012 at Bank of America. The account was used to deposit payments from victims of the "mortgage modification" scheme.

13

44.    On or about August 30, 2013, DACANAY opened in the name of "Trust Services" an account with account number ending in 3426 at Comerica. The account was used to deposit payments from victims of the "mortgage modification" scheme.

45.    On or about August 30, 2013, DACANAY opened in the name of "Payment Processing Services" an account with account number ending in 3418 at Comerica. The account was used to deposit payments from victims of the "mortgage modification" scheme.

46.    On or about November 6, 2013, DACANAY opened in the name of "Payment Processing Services" an account with account number ending in 5089 at Bank of the West. The account was used to deposit payments from victims of the "mortgage modification" scheme.

47.    On or about November 7, 2013, Philip O_____ and his co-conspirators, using the alias "Peter Bayani," leased a retail mailbox in the names of "Technical Solutions, Inc.," "Computers Advantage," and "Account Services" at the UPS Store at 14271 Jeffrey Road, #504, Irvine, California. The mailbox was used to receive payments from victims of the "mortgage modification" scheme.

48.    On or about November 16, 2013, DACANAY opened in the name of "Payment Processing Services" an account with account number ending in 0923 at JP Morgan Chase. The account was used to deposit payments from victims of the "mortgage modification" scheme.

49.    On or about November 16, 2013, DACANAY opened in the name of "Trust Services" an account with account number ending in 8131 at JP Morgan Chase. The account was used to deposit payments from victims of the "mortgage modification" scheme.

14

50.   On or about November 25, 2013, DACANAY opened in the name of "Trust Services" an account with account number ending in 4494 at Wells Fargo. The account was used to deposit payments from victims of the "mortgage modification" scheme.

51.   On or about December 30, 2013, DACANAY opened in the name of "Trust Services" an account with account number ending in 7000 at Union Bank. The account was used to deposit payments from victims of the "mortgage modification" scheme.

52.   On or about January 10, 2014, JOHNSON and Philip O_____ and their co-conspirators, using the alias "Peter Bayani," leased a retail mailbox in the names of "Parts Plus," "CompuPros," and "Account Services" at the UPS Store at 4790 Irvine Boulevard, #105-422, Irvine, California. The mailbox was used to receive payments from victims of the "mortgage modification" scheme. To lease the mailbox, Philip O_____ presented a fraudulent California driver's license bearing a photograph of Philip O_____ and the name "Peter Bayani" with driver's license number Dxxx3857. This driver's license number belonged to Thomas H_____.

53.   On or about February 4, 2014, DACANAY opened in the name of "Escrow Payment Solutions" an account with account number ending in 0459 at Union Bank. The account was used to deposit payments from victims of the "mortgage modification" scheme.

54.   On or about February 17, 2014, Philip O_____ and his co-conspirators, using the alias "Peter Bayani," leased a retail mailbox in the names of "Computer Plus" and "Account Services" at the UPS Store at 1439 West Chapman Ave, #82, Orange, California. The mailbox was used to receive payments from victims of the "mortgage modification" scheme.

55.   On or about March 7, 2014, Philip O_____ and his co-conspirators, using the alias "Peter Bayani," leased a retail mailbox in the names of "Account Services" and "Escrow

15

Services" at the Village Mailbox at 3006 South Vermont Ave, #461, Los Angeles, California. The mailbox was used to receive payments from victims of the "mortgage modification" scheme.

56. On or about March 7, 2014, Philip O_____ and his co-conspirators, using the alias "Peter Bayani," leased a retail mailbox at the LA Mail Center at 644 North Fuller Ave, #505, Los Angeles, California. The mailbox was used to receive payments from victims of the "mortgage modification" scheme.

57. On or about March 22, 2014, Philip O_____ and his co-conspirators, using the alias "Peter Bayani," leased a retail mailbox in the names of "Trial Services," "Account Services," and "Trust Services" at the Sunset Boulevard Mailboxes at 7119 W Sunset Boulevard, #708, Los Angeles, California. The mailbox was used to receive payments from victims of the "mortgage modification" scheme.

58. On or about March 24, 2014, Philip O_____ and his co-conspirators, using the alias "Peter Bayani," leased a retail mailbox at the Postal Annex at 321 North Pass Avenue, #400, Burbank, California. The mailbox was used to receive payments from victims of the "mortgage modification" scheme.

59. On or about March 24, 2014, Philip O_____ and his co-conspirators, using the alias "Peter Bayani," leased a retail mailbox in the names of "Account Services" at the NoHo Mailboxes at 5062 Lankershim Boulevard, #160, Los Angeles, California. The mailbox was used to receive payments from victims of the "mortgage modification" scheme.

*Victim David A_____*

60. In or about March 2013, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered

16

supposed "mortgage modification" services to David A_____.

61.     On or about April 1, 2013, the defendants and their co-conspirators, using the alias "Evan Park" and the e-mail account evanpark@amfinsvcs.org, sent to David A____'s AOL email account a message with the subject "Loan Modification Approval Documents" and an attached document instructing David A_____ to send a supposed "reinstatement fee" of $4,731.63 to the Wilshire Boulevard retail mailbox opened by JOHNSON on or about January 14, 2013.

62.     On or about April 3, 2013, David A_____ sent by overnight mail a cashier's check in the amount of $4,731.63 to the Wilshire Boulevard mailbox.

63.     On or about April 5, 2013, the defendants and their co-conspirators deposited David A_____'s payment of $4,731.63 into the JP Morgan Chase account opened by Michael H____ on February 18, 2013.

64.     On or about April 25, 2013, Sanchez and his co-conspirators, using the alias "Nelson Cruz" and the email account nelsoncruz@processingservices.org, sent to David A_____'s AOL email account a message with the name of his wife, Jessica L_____, in the subject and with an attached document instructing David A_____ to send his first mortgage payment to the Wilshire Boulevard mailbox.

*Victim Robert M_____*

65.     In or about June 2013, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered supposed "mortgage modification" services to Robert M_____.

17

66.     In or about June 2013, Sanchez and his co-conspirators, using the alias "Nelson Cruz," spoke to Robert M_____ by telephone telling him to send a supposed "reinstatement fee" of $2,711.00 to the Culver Drive retail mailbox opened by PEREZ on June 19, 2013.

67.     In or about July 2013, Robert M_____ sent by overnight mail a cashier's check in the amount of $1,355.25 and another cashier's check in the amount of $1,355.75 to the Culver Drive mailbox.

68.     On or about July 3 and 15, 2013, the defendants and their co-conspirators deposited Robert M_____'s payments of $1,355.25 and $1,355.75, respectively, into the Bank of America account opened by DACANAY on June 24, 2013.

69.     In or about August and September 2013, Robert M_____ sent by overnight mail a cashier's check in the amount of $504 and another cashier's check in the amount of $504 to the El Camino Real mailbox opened by PEREZ on June 16, 2013.

70.     On or about August 29, 2013, the defendants and their co-conspirators deposited Robert M_____'s first mortgage payment of $504 into the Bank of America account opened by Kelvin P_____ on March 22, 2013.

71.     On or about September 10, 2013, the defendants and their co-conspirators deposited Robert M_____'s second mortgage payment of $504 into the Bank of America account opened by Kelvin P_____ on March 22, 2013.

72.     On or about September 23, 2013, Sanchez and Ayala and their co-conspirators, using email account gracewilliams@amfinsvcs.org, sent a message to Robert M_____ telling him to continue sending his monthly mortgage payments of $503.90 to the El Camino Real retail mailbox opened by PEREZ on June 16, 2013. The email was sent from Internet Protocol (IP)

address 68.108.95.189 for which Sanchez was the subscriber at Sanchez and Ayala's residence in Las Vegas, Nevada.

*Victim Gladys W_____*

73.     In or about July or August 2013, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered supposed "mortgage modification" services to Gladys W_____.

74.     On or about August 8, 2013, the defendants and their co-conspirators, using the alias "Jason Olsen" and email account j.olsen@equityrestorationgroup.com, sent a message to Gladys W_____'s AOL email account telling her to send a supposed "reinstatement fee" of $7,477.69 to the El Camino Real retail mailbox opened by PEREZ on or about June 16, 2013.

75.     On or about August 9, 2013, Gladys W_____ sent by overnight mail a cashier's check in the amount of $7,477.69 to the El Camino Real retail mailbox opened by PEREZ on or about June 16, 2013.

76.     On or about August 10, 2013, the defendants and their co-conspirators deposited Gladys W_____'s $7,477.69 payment into the Bank of America account opened by DACANAY on June 24, 2013.

77.     On or about September 24, 2013, Sanchez and Ayala and their co-conspirators, using the alias "Grace Williams" and email account gracewilliams@amfinsvcs.org, sent a message to Gladys W_____'s AOL email account with an attached "mortgage payment coupon" and instructions to send mortgage payments of $721.98 to the Culver Drive retail mailbox opened by PEREZ on June 19, 2013.  The coupon was fraudulently imprinted with the U.S.

19

Treasury's seal. The email was sent from the same IP address used to send the September 23, 2013 message to Robert M_____.

78.     On or about September 30, 2013, Gladys M_____ sent by overnight mail a money order in the amount of $721.98 to the Culver Drive mailbox.

79.     On or about October 2, 2013, the defendants and their co-conspirators deposited Gladys W_____'s $721.98 payment into the Bank of America account opened by Kelvin P_____ on March 22, 2013.

*Victim Wilner J_____*

80.     In or about September 2013, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered supposed "mortgage modification" services to Wilner J_____.

81.     In or about October 2013, Sanchez and his co-conspirators sent to Wilner J_____'s AOL email account a message containing an attached document instructing Wilner J_____ to send a supposed "reinstatement fee" totaling $7,493.74 to the El Camino Real retail mailbox opened by PEREZ on June 16, 2013.

82.     On or about October 25, 2013, Wilner J_____ sent by overnight mail a cashier's check in the amount of $7,493.74 to the El Camino Real mailbox.

83.     On or about October 29, 2013, the defendants and their co-conspirators deposited Wilner J_____'s $7,493.74 payment into the Comerica account with account number ending in 3418 opened by DACANAY on August 30, 2013.

*Victim Michelle M_____*

84.     In or about October 2013, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered

supposed "reinstatement fee" totaling $10,000 to the Jeffrey Road retail mailbox opened by Philip O_____ on November 7, 2013.

91.     On or about December 21, 2013, Scott M_____ sent by overnight mail two cashier's checks for $5,000 each totaling $10,000 to the Jeffrey Road mailbox.

92.     On or about December 26, 2013, the defendants and their co-conspirators deposited Scott M_____'s first mortgage payment of $5,000 into the Comerica account with account number ending in 3426 opened by DACANAY on August 30, 2013. On or about December 26, 2013, the defendants and their co-conspirators deposited Scott M_____'s second payment of $5,000 into the Wells Fargo account opened by DACANAY on November 25, 2013.

*Victim Aisha P_____*

93.     In or about May 2014, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered supposed "mortgage modification" services to Aisha P_____.

94.     On or about May 20, 2014, Sanchez and Ayala and their co-conspirators, using alias "Melissa Page" and email account m.page@rcosvcs.org, sent a message to Aisha P_____'s AOL email account telling her to fill out an attached Financial Worksheet and Letter of Authorization and to fax them to "Monica Gonzalez."

95.     On or about June 2, 2014, Sanchez and Ayala and their co-conspirators, using alias "Melissa Page" and email account m.page@rcosvcs.org, sent a message to Aisha P_____'s AOL email account telling her to complete attached forms and to fax them along with a copy of "certified funds" to "Melissa Page." The attached documents included a Loan Modification Approval fraudulently bearing the logo of Aisha P_____'s lender Ocwen. The documents

22

instructed her to send a supposed "reinstatement fee" of $3,601.14 to the North Pass Avenue retail mailbox opened by Philip O_____ on March 24, 2014.

96.     On or about June 6, 2014, Aisha P_____ sent by overnight mail a cashier's check in the amount of $3,601.14 to the North Pass Avenue mailbox.

97.     On or about June 10, 2014, the defendants and their co-conspirators cashed Aisha P_____'s payment of $3,601.14 through a check cashing facility called Benny's Market in Los Angeles, California.

*Victim David W_____*

98.     In or about February of 2014, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered supposed "mortgage modification" services to David W_____.

99.     On or about April 2, 2014, the defendants and their co-conspirators, using the alias "Melissa Page" and email account m.page@rcosvcs.org, sent to David W_____'s AOL email account a message containing an attached document instructing David W_____ to send a supposed "reinstatement fee" totaling $1,706 to the Lankershim Boulevard retail mailbox opened by Philip O_____ on March 24, 2014.

100.    On or about April 4, 2014, David W_____ sent by overnight mail a cashier's check in the amount of $1,706 to the Lankershim Boulevard mailbox.

101.    On or about April 8, 2014, the defendants and their co-conspirators cashed the check for $1,706 through a check cashing facility called Benny's Market in Los Angeles, California.

*Victim Daniel T_____*

102.    In or about February 2014, the defendants and their co-conspirators sent a mass mailing from Seko Direct Marketing that was targeted to distressed homeowners and that offered supposed "mortgage modification" services to Daniel T_____.

103.    On or about March 31, 2014, the defendants and their co-conspirators, using the alias "Melissa Page" and email account m.page@rcosvcs.org, sent to Daniel T_____'s AOL email account a message instructing Daniel T_____ to fill out the attached document and fax it back attention to "Alyssa Dawson."

104.    On or about April 3, 2014, Sanchez and his co-conspirators, using the alias "Chris Ward" and email account chris.ward@hopercenter.org, sent to Daniel T_____'s AOL email account a message containing an attached document instructing Daniel T_____ to send a supposed "reinstatement fee" totaling $1,367.58 to the Lankershim Boulevard retail mailbox opened by Philip O_____ on March 24, 2014.

105.    On or about April 4, 2014, Daniel T_____ sent by overnight mail a cashier's check in the amount of $1,367.58 to the Lankershim Boulevard mailbox.

106.    In or about May 2014, Sanchez and his co-conspirators, using the alias "Chris Ward" and email account chris.ward@hopercenter.org, sent to Daniel T_____'s AOL email account a message containing an attached document instructing Daniel T_____ to send his trial mortgage payments of $302.35 each to the Sunset Boulevard retail mailbox opened by Philip O_____ on March 22, 2014.

107.    On or about May 30, 2014, Daniel T_____ sent by regular postal mail a cashier's check in the amount of $302.35 to the Sunset Boulevard mailbox.

24

108.     On or about June 4, 2014, Sanchez and his co-conspirators, using the alias "Chris Ward" and email account chris.ward@hopercenter.org, sent to Daniel T_____'s AOL email account a message advising Daniel T_____ of the receipt of his trial payment and that "Ward" was working to get the foreclosure auction date cancelled.

109.     On or about May 7, 2014, the defendants and their co-conspirators cashed Daniel T_____'s payment of $1,367.58 through a check cashing facility called Benny's Market in Los Angeles, California.

110.     On or about June 2, 2014, the defendants and their co-conspirators cashed Daniel T_____'s payment of $302.35 at a check cashing facility called Benny's Market in Los Angeles, California.

*Other Victims and Overt Acts*

111.     On or about October 2, 2012, JOHNSON caused Quadrant Financial to file with the State of California as a limited liability company, listing JOHNSON'S home address in Huntington Beach, California, as its place of business and JOHNSON as its sole principal and chief executive officer.  JOHNSON received approximately $195,000 in proceeds from the fraud through payments to Quadrant Financial from bank accounts into which victim funds were deposited.  JOHNSON also made payments from Quadrant Financial accounts to defendants and their co-conspirators, including MANISCAN, SEKO, and Philip O_____.

112.     On or about the following dates, the defendants and their co-conspirators fraudulently received funds from the following victims in the following amounts:

25

| Date | Victim | Amount of Payment |
|------|--------|-------------------|
| 03/01/13 | Susanne P_____ | $2,158 |
| 07/25/13 | Carol H_____ | $7,301 |
| 09/19/13 | Daniel W_____ | $1,539 |
| 06/01/13 | Kim I_____ | $3,000 |
| 05/31/13 | Paul H_____ | $5,870 |
| 11/01/13 | Danita V_____ | $1,884 |
| 9/26/13 | James W_____ | $4,872 |
| 04/03/14 | Tom L_____ | $6,789 |
| 03/29/13 | Cynthia M_____ | $4,000 |

113.    Additionally, on or about the following dates, the defendants and their co-conspirators engaged in text messaging regarding the following victims and their payments:

| Date | Victim | Amount of Payment |
|------|--------|-------------------|
| 03/04/14 | Selwyn O_____ | $2,239 |
| 12/20/13 | William Edward W____, Jr. | $2,847 |
| 11/14/13 | Jennifer L_____ | $829 |
| 02/24/14 | Michelle H_____ | $680 |
| 01/23/14 | Donna Bragg S_____ | $2,500 |
| 12/03/13 | Nicole L_____ | $1,000 |
| 02/05/14 | Jason B_____ | $871 |
| 01/31/14 | Donald R_____ | $800 |
| 01/30/14 | Greg S_____ | $1,000 |

(In violation of Title 18, United States Code, Section 1349)

## COUNTS TWO THROUGH EIGHT

### WIRE FRAUD

THE GRAND JURY FURTHER CHARGES THAT:

114.    The allegations contained in paragraphs 1 through 14 and 16 through 113 are incorporated here by reference.

115.    On or about the dates below, in the Eastern District of Virginia and elsewhere, the defendants,

ROSCOE ORTEGA UMALI,
a/k/a "Sco,"
a/k/a "Scozilla,"
a/k/a "John Ortega,"

JOSHUA DAVID JOHNSON,
a/k/a "Daniel Jensen,"
a/k/a "Derek James Olsen,"
a/k/a "Simon Andrews,"
a/k/a "Jay Thompson,"
a/k/a "Jason Olsen,"

ISAAC JOSHUA PEREZ,
a/k/a "Alex Lee,"
a/k/a "Anthony Meyers,"

JEFFERSON MANISCAN,
a/k/a "Yogi,"
a/k/a "Alvin Mayfield,"
a/k/a "Lance Parker,"
a/k/a "Tom Spiro,"
a/k/a/ "James Atwood,"

RAYMUND OQUENDO DACANAY, and

JEN SEKO,
a/k/a "Hanh Thuy Nguyen,"

having knowingly and intentionally devised a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises,

27

transmitted and caused to be transmitted by means of wire communication in interstate

commerce writings, signs, signals, pictures, and sounds, that is, the electronic mail messages sent

to the AOL email accounts of the victims as described below, for the purpose of executing such

scheme and artifice, each such transmission being a separate count:

| Count | Date | Sender | Victim |
|-------|------|--------|--------|
| 2 | April 1, 2013 | evanpark@amfinsvcs.org | David A_____ |
| 3 | April 25, 2013 | nelsoncruz@processingservices.org | David A_____ |
| 4 | August 8, 2013 | j.olsen@equityrestorationgroup.org | Gladys W_____ |
| 5 | September 24, 2013 | gracewilliams@amfinsvcs.org | Gladys W_____ |
| 6 | April 2, 2014 | m.page@rcosvcs.org | David W_____ |
| 7 | June 4, 2014 | chris.ward@hopercenter.org | Daniel T_____ |
| 8 | December 2013 | l.parker@ncsus.org | Scott M_____ |

(In violation of Title 18, United States Code, Section 1343)

28

### FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

Pursuant to Federal Rule of Criminal Procedure 32.2(a), if defendants are convicted of the conspiracy and wire fraud offenses alleged in Counts One through Eight above, they shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), the following property:

(a)     A sum of money equal to at least $3.7 million in U.S. currency, representing the amount of proceeds obtained as a result of the violation of Title 18, United States Code, Section 1349, as described in Count One, and the violations of Title 18, United States Code, Section 1343, as described in Counts Two through Eight;

(b)     Substitute property, up to the value of the amount described in subparagraph (a), if, by any act or omission of defendants, the property described in subparagraph (a), or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure)

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

Foreperson

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____
James P. Gillis
Samantha P. Bateman
Assistant United States Attorneys

30